CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

MAR 28 2022

JULIA C. DUDLEY, CLERK
BY: /s/
    DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| JIMMY EDWARD TINSLEY,<br>Petitioner, | )<br>)<br>) Civil Action No. 7:21cv270<br>) |
| v. | ) MEMORANDUM OPINION<br>) |
| HAROLD W. CLARKE, DIRECTOR,<br>Respondent. | ) By: Michael F. Urbanski<br>) Chief United States District Judge |

Jimmy Edward Tinsley, a Virginia inmate proceeding pro se, has filed a petition for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254, challenging his 2018 convictions in Henry County Circuit Court for five charges of distributing cocaine, a Schedule II substance, after having been twice convicted of the same or similar charge. The respondent has filed a motion to dismiss, to which Tinsley has replied, making this matter ripe for decision. After careful review of the record and arguments of the parties, the court concludes that the respondent's motion must be granted, and Tinsley's petition must be dismissed as time barred.

I.

A. Factual Background

Between June 2013 and August 2013, several officers from the Henry County Sheriff's Office worked with a pair of confidential informants (CIs) to make controlled purchases of cocaine from someone known to the CIs as "T.J." None of the officers knew who T.J. was. The male CI placed numerous telephone calls to (336) 686-6981, recorded by the officers, to arrange each purchase. All purchases were arranged at the Sheetz on Greensboro Road in Ridgeway, Virginia. Surveilling officers stationed themselves in the parking lot of the Exxon gas station across the street from Sheetz. The male CI was outfitted with audiovisual

equipment for each buy. The female CI drove to each transaction, as the male had no driver's license, but driving was her only role. Both the male and the female CI were searched before and after each transaction, as was their vehicle, and the officers followed the CIs from the meeting place to Sheetz and back, maintaining visual surveillance.

The first recorded transaction occurred on June 24, 2013, monitored by Investigator Timothy Brummitt and Investigator Mark Winn. They provided $400 to the CIs for the purchase. The CIs arrived at Sheetz at 9:00 p.m., the agreed upon time. At 9:37 p.m., a small white car pulled up beside the CIs' car. The male CI got out of the passenger side of his car and got into the white vehicle, then returned to his car. Because it was nighttime, visibility was poor, and neither officer could see the driver of the white car. The video was also poor, so the officers still did not know the seller's identity. The CI returned $75 in change, plus two green baggies of off-white chunky substance that field tested positive for cocaine. Sargent Greg Lowery, the evidence custodian in 2013, received the evidence from the officers and personally delivered it to the Division of Forensic Science (DFS) lab in Roanoke. Stephan Hokanson, a chemist at DFS, analyzed the material, three grams of solid material containing cocaine.

Investigator Winn and Lieutenant Chris Stovall oversaw the second controlled buy on June 25, 2013, a little earlier in the day for better lighting. They gave the CIs $500 for this purchase, as the CI was trying to purchase a gun in addition to the drugs. The same target vehicle arrived at Sheetz. The officers still could not see inside the target car to identify the seller. The male CI got in the white car and then returned to his own car. At the pre-arranged meeting location, the CI returned $275 of the money and two packages wrapped in colored

2

plastic, containing an off-white rock substance, plus an additional loose piece of rock. Following the same chain of custody procedures, the items were sent to DFS, where another chemist, David Murariu, analyzed the material, 2.9979 grams of a substance containing cocaine.

On July 24, 2013, Winn and Stovall oversaw the third controlled buy, providing $660 to the CIs to purchase a gun and a quarter ounce of cocaine. This time, the seller arrived in a gray four-door sedan, a different car. The officers still could not see the driver, and no one got out of the target car. The male CI got in the gray car briefly and then returned to his car. At the meeting place, the CI returned $335 of the money and provided a scale dish containing an open baggie with loose chunks of off-white substance. The officers did not know where the scale component had come from. Once the material reached the lab, Stephen Hokanson found four grams of material containing cocaine, just over half what the CIs had paid for.

The fourth purchase occurred on August 28, 2013, overseen by Stovall and Lieutenant Randall Helbert. They provided $300 to the CIs for the purchase of cocaine. From their surveillance location, the officers saw a tan Toyota with Texas license plates pull into Sheetz and back into a parking place. A man got out of the passenger side of the Toyota and got into the back seat. Because it was a different car from the previous two cars, the officers did not realize it was the target vehicle until they heard the CI and the seller talking on the wire during the transaction. The CI had pulled the car directly in front of the parked Toyota. The male CI got out of the Toyota and returned to his car. The man in the back seat of the Toyota got out and returned to the front seat. That passenger was visible on the video, but the driver was not. The male CI did not speak with or interact with the passenger. When they returned to

3

the meeting place, the CIs turned over a brown paper towel or ripped paper bag with loose white substance on it. Hokanson at DFS testified that the powder substance weighed 5.5 grams and contained cocaine.

On August 29, 2013, Brummitt, Winn, Helbert, and Lieutenant Daniel Harold oversaw the final purchase transaction at Sheetz, after providing $700 to the CIs for the deal. The tan Toyota returned, and the male passenger got into the back seat, allowing the male CI to get in the front seat for the transaction. As the CIs left the Sheetz parking lot, the Toyota pulled up to the gas tank, and the driver got out and began pumping gas. The officers notified the CIs by phone to remain at the Farmer's Market down the street until the officers caught up with them. Lt. Harold took video of the man pumping gas into the Toyota and identified him as the driver of the car. When the Toyota left, the officers contacted dispatch to request a traffic stop of the Toyota to determine the identity of the occupants. The officers then met up with the CIs to collect the off-white chunk substance and the refunded $400, as they still had not been able to purchase a gun from the target. Stephen Hokanson at DFS analyzed the rock-like substance, 6.2 grams solid, containing cocaine.

Patrol Officer Steven Ball conducted a traffic stop in his marked police unit, as requested. The vice division had advised that a controlled purchase had been made from the occupants, and the officers needed them identified. Tinsley's counsel objected that the traffic stop was pretextual and without probable cause, but the court overruled the objection, noting that counsel failed to comply with Virginia Code § 19.2-266.2 by filing a motion to suppress at least seven days before trial. Ball stopped a 2014 tan Toyota with Texas license plates. The driver was Jimmy Tinsley, and the passenger was Corey Pearson. No evidence was found in

4

or taken from the car, and after verifying their identities with DMV photographs, Tinsley and Pearson were allowed to leave. CCR5[1] at 197 – 202. A few months later, after Tinsley's arrest, Investigator Brummit listened to several recorded phone calls from the jail to see if he heard any voice that he recognized from the phone calls made by the CI to TJ and from the recordings made during the controlled buys. He identified a voice that he recognized. Although the call was charged to the account of a different inmate, time-stamped video recordings corresponding to the time-stamped phone recordings verified that the voice Brummit recognized was Tinsley's. Id. at 171 – 188.

## B. Procedural History

On May 19, 2014, a grand jury in Henry County Circuit Court issued indictments against Tinsley for distribution of cocaine on June 24, 2013, July 24, 2013, August 28, 2013, and August 29, 2013, each after having been previously convicted twice for a substantially similar offense. On July 21, 2014, a grand jury issued an additional indictment for third offense distribution of cocaine on June 25, 2013. Tinsley was arrested in Rockingham County, North Carolina, on the Henry County Charges, and the Commonwealth Attorney applied for a warrant of extradition. Tinsley came into custody of the Henry County Sheriff's Office on January 20, 2015. CCR1[2] at 5 – 25.

The court appointed counsel for Tinsley on January 26, 2015, and the initial trial date was set for March 16, 2015, but counsel had to withdraw because of an actual conflict of

---

[1] References to the trial transcript refer to the page numbers in the bottom center of the Henry County Circuit Court Record in Commonwealth v. Tinsley, Record No. CR14-820, abbreviated "CCR5."

[2] Most pleadings for the five cases were filed in Commonwealth v. Tinsley, Record No. CR14-582, abbreviated "CCR1." References to this volume of the record will cite the typed page numbers in the bottom center of each page.

5

interest. A new attorney was appointed, who filed a prompt motion for discovery. The matter was continued to May 7, 2015, for trial. Id. at 37 – 50. On April 29, 2015, Tinsley was granted a $3000 bond and counsel continued the case to September 21, 2015, for trial. Id. at 54 – 55. On July 24, 2015, the Commonwealth Attorney filed a motion to revoke Tinsley's bond, as he had failed to maintain contact with the Henry County Sheriff's Office and had failed to appear for two meetings scheduled with counsel, the Commonwealth Attorney, and Investigator Stovall. The court revoked the bond and issued a capias for contempt of court. Id. at 70 -72.

Tinsley was later located in Guilford County, North Carolina, where he was being held on three charges of trafficking cocaine and three charges of possession of a firearm by a convicted felon. The Commonwealth requested a governor's warrant on January 28, 2016, which was issued February 2, 2016. At Tinsley's request on August 17, 2017, pursuant to the Interstate Agreement on Detainers, the Commonwealth temporarily took custody of Tinsley in September 2017 to resolve the outstanding charges. The matter was set for trial to be held on December 20, 2017. Id. at 113 – 132. On December 15, 2017, counsel filed a motion to withdraw, based upon deterioration in the relationship with Tinsley, and another attorney was appointed, necessitating a continuance. Id. at 139 – 147.

Trial was set for February 16, 2018. Tinsley filed a motion to dismiss, alleging that the Commonwealth was required to bring him to trial within 120 days of his arrival in Virginia, under the Interstate Agreement on Detainers. The Commonwealth asserted that it had 180 days from Tinsley's request to be tried, and the scheduled trial date was on the 180th day. The court denied the motion to dismiss, and a bench trial was held on February 16, 2018. Id. at 154 – 195. After hearing the evidence previously summarized in subsection A above, the court

6

found Tinsley guilty on all five charges and scheduled sentencing for March 2, 2018. Id. at 234 – 235. On March 2, 2018, the court sentenced Tinsley to the mandatory minimum sentence of ten years on each count, resulting in a total sentence of fifty years. The judgment order was entered March 13, 2018. Id. at 270 – 271.

Tinsley appealed his conviction and sentence, alleging that the trial court erred in refusing to suppress the evidence based on the warrantless stop of his car and that the case should have been dismissed because he was not brought to trial within 120 days of returning to Virginia under the Interstate Detainer Agreement. By per curiam opinion, the Court of Appeals of Virginia denied his appeal. Tinsley v. Commonwealth, Record No. 0417-18-3 (Va. Ct. App. Aug. 7, 2019). Tinsley did not file any further appeals.

On September 4, 2020, Tinsley signed a state petition for habeas corpus and had his signature notarized. The sole issue raised in the petition was his attorney's failure to consult with him about filing his direct appeal to the Supreme Court of Virginia. According to the Virginia Department of Corrections stamp on the back of the envelope, a copy of which is included on page 13 of the record of the Virginia Supreme Court, the petition was received by the institutional mailroom on September 8, 2020. The Supreme Court of Virginia received his petition on September 11, 2020. Finding his petition untimely, the court dismissed the petition and then denied Tinsley's request for rehearing. Tinsley v. Clarke, Record No. 201130 (Va. order dismissing appeal entered January 26, 2021, reh'g denied March 25, 2021).

Tinsley filed the current § 2254 petition on April 15, 2021, according to his certification of mailing. Pleadings filed by an incarcerated pro se litigant are deemed filed when delivered to prison authorities for mailing. Houston v. Lack, 487 U.S. 266, 270 (1988). His current

7

petition raises fifteen different claims, mostly ineffective assistance of counsel claims. Because of the court's ruling on the timeliness issue, however, it is unnecessary to list those issues here.

## II.

Under 28 U.S.C. § 2244(d)(1), a petitioner has one year in which to file a federal habeas corpus petition. This statute of limitations runs from the latest of:

> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>
> (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
>
> (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>
> (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d)(1). Further, the statute of limitations is tolled during the time in which "a properly filed application for State post-conviction or other collateral review . . . is pending." 28 U.S.C. § 2244(d)(2). In rare cases, the court may disregard the statute of limitations by applying equitable tolling or the "actual innocence" exception.

### A. **Within One Year of the Date on which the Judgment Became Final**

Because he did not appeal the August 7, 2019, decision of the Court of Appeals, the judgment in Tinsley's case became final on September 6, 2019, the last date on which he could have filed his appeal to the Supreme Court of Virginia. The federal statute of limitations under

8

§ 2244(d)(1)(A) began running on that date and expired on September 7, 2020 (because September 6 was a Sunday). The § 2254 petition, filed April 15, 2021, was untimely, unless a different starting date or a tolling provision applies.

## B. Impediment Created by State Action is Removed

Section 2244(d)(1)(B) allows the statute of limitations to begin running when an impediment is removed, if the impediment was created by State action in violation of the Constitution or laws of the United States. Tinsley asserts two impediments: The coronavirus-19 pandemic and the closure of prison libraries to inmates because of the pandemic. Neither of these alleged impediments is sufficient to give Tinsley a delayed statute of limitations. First, the pandemic was not state created, nor has the pandemic prevented other prisoners from filing habeas petitions. Second, lack of access to the prison law library is not an "impediment" within the meaning of § 2244(d)(1)(B). Gaston v. Palmer, 417, F.3d 1030, 1035 (9th Cir. 2005). Finally, the library restrictions that Tinsley complains about did not go into effect until March 30, 2020, more than seven months after the court of appeals opinion. Because there was no state court impediment to filing, this section does not provide a different date for the statute of limitations.

## C. Newly Recognized Constitutional Right

Tinsley has not alleged that he is asserting a newly recognized constitutional right, so this subsection does not apply.

## D. When Factual Basis of Claims Discovered

Most of the claims in Tinsley's § 2254 petition were not raised in his state habeas petition nor any time prior to the state petition. In replying to respondent's motion to dismiss,

9

Tinsley asserts that he continued to discover "facts" about his case after he filed the state habeas. Truth Aff. of Facts in Conjunction w/ Newly Discovered Evid., ECF No. 19 at ¶ 5. Tinsley apparently misunderstands the meaning of "facts" in this context. A cursory review of Tinsley's claims reveals that he knew the facts on the date of his trial: He knew that his attorney did not object to phone calls being played for the court; he knew that his attorney did not object to his prior convictions being introduced in evidence; he knew the words spoken by the prosecutor in closing argument; he knew that his attorney had not filed motions. He knew all that on February 16, 2018. What he perhaps did not know was the possible legal significance of those facts, what legal theories might be available based on those facts. Subsection (d)(1)(D) delays the start of the statute of limitations when new facts become known (or could become known, in the exercise of due diligence), not when an inmate understands the potential legal significance of those facts. Owens v. Boyd, 235 F.3d 356, 359 (7th Cir. 2000); Guinn v. Davis, No. 7:20cv00306, 2021 WL 2909585, at *5 (W.D. Va. July 12, 2021).

### E. Statutory Tolling

The habeas statute provides for tolling of the statute of limitations during a time in which a "properly filed application for State post-conviction or other collateral review . . . is pending." A state habeas petition does not delay the start of the limitation period; rather, the period starts running when the state judgment becomes final, but the clock is stopped when a state habeas proceeding is properly filed. Harris v. Hutchinson, 209 F.3d 325, 327 (4th Cir. 2000). When the state habeas is no longer pending, the clock starts running again, picking up where it left off; it does not start anew. Id. at 328.

10

Assuming that Tinsley's state habeas petition was delivered to the prison's mail system on September 4, 2020, and therefore, properly and timely filed,[3] that would be two days before the federal statute of limitations expired. The statute would stop running while the state case was pending. Once the Supreme Court of Virginia refused Tinsley's petition for rehearing on March 25, 2021, the state post-conviction proceedings ended, and the statute resumed where it left off, with two days left. March 27, 2021, fell on a Saturday, so Tinsley would have had until the following Monday, March 29, 2021, to file his federal petition. He did not place the petition in the prison mail until April 15, 2021, at the earliest, which was more than two weeks past the deadline.

Further, the Supreme Court of Virginia apparently did not find that Tinsley placed his state petition in the institutional mail on September 4, 2020. As noted in the procedural background section, page 13 of the Supreme Court's record is a copy of a mailroom stamp, showing that the state petition was received in the institutional mailroom on September 8, 2020, a day after the statute of limitations expired. The Virginia Supreme Court held that the petition was untimely, and if the state petition is untimely under state law, "that is the end of the matter for purposes of § 2244(d)(2)." Pace v. DiGuglielmo, 544 U.S. 408, 414 (2005) (internal citation omitted). If a petition is untimely in state court, it is not "properly filed," and therefore does not toll the statute of limitations. Artuz v. Bennett, 531 U.S. 4, 11 (2000).

---

[3] Respondent, in footnote 2 of its brief, incorrectly identifies August 7, 2020, as the state statute of limitations, based on the August 7, 2019, decision of the Court of Appeals of Virginia. However, Tinsley had 30 days in which to file a petition for appeal in the Supreme Court of Virginia, which meant his state judgment was not final until September 6, 2019, giving him until September 7, 2020, to file his state habeas petition (because September 6, 2020, fell on Sunday). "A habeas corpus petition attacking a criminal conviction or sentence . . . shall be filed within two years from the date of final judgment in the trial court or within one year from either final disposition of the direct appeal in state court or the time for filing such appeal has expired, whichever is later." Va. Code § 8.01-654 (2019 amend.).

11

Because the state petition was not "properly filed" and did not toll the statute of limitations, Tinsley's § 2254 petition was filed more than six months past the deadline.

Tinsley's final argument on why his state petition should have been considered timely is that the Chief Justice's Order Declaring a Judicial Emergency, entered March 16, 2020, tolled and extended deadlines and due dates for 21 days. What Tinsley failed to realize is that a subsequent order, dated July 8, 2020, stated: "beginning July 20, 2020, there shall be no further tolling of deadlines regarding filings made pursuant to Part Five of the Rules of the Supreme Court of Virginia . . ." In re: Seventh Order Extending Declaration of Judicial Emergency in Response to COVID-19 Emergency, (Va. July 8, 2020), available at https://www.vacourts.gov/news/items/covid/scv_emergency_orders.pdf. Thus, by September 2020, no extension was in place allowing Tinsley to file his state petition late. Further, any extension granted by the state court would not apply to federal court deadlines. Accordingly, statutory tolling does not save Tinsley's untimely petition.

F. Equitable Tolling

The United States Supreme Court has recognized a narrow exception for equitable tolling if the petitioner has pursued his rights diligently and some extraordinary circumstances prevented his timely filing. Holland v. Florida, 560 U.S. 631, 636, 649 (2010). Tinsley has failed to meet either test.

While maximum diligence is not required, a petitioner must exercise reasonable diligence, that level of care a reasonable person would exercise in his important affairs. Id. The Court of Appeals dismissed Tinsley's appeal on August 7, 2019. There was no COVID-19 emergency then. There is no sign in the records of the Court of Appeals of Virginia or in

the records of the Supreme Court of Virginia that Tinsley made any effort to file an appeal on his own behalf, nor did he timely file his state habeas. More than seven months passed before library access was restricted due to COVID-19. Yet, in September 2020, while library restrictions were still in place, Tinsley filed his state petition, raising a single issue: His attorney's failure to appeal to the Supreme Court of Virginia. That issue is straight-forward, and there is absolutely no reason that Tinsley could not have filed the state petition far sooner. Because he waited so long to file that petition, even if he had filed it on September 4, 2020, he would have had only two days to file his federal habeas once the state court dispensed with the case. Under similar circumstances, the Fourth Circuit Court of Appeals has found that the petitioner was not diligent in pursuing his remedies, because he did not account for reasonably predictable time needed for mail delivery. Spencer v. Sutton, 239 F.3d 626, 630 (4th Cir. 2001).

To establish extraordinary circumstances, Tinsley must show that he was prevented from filing a timely petition by circumstances beyond his control and external to his own conduct. In some settings, COVID-19 might well constitute such a circumstance, if Tinsley had been physically incapacitated for a lengthy time with the illness. However, the only relevance of COVID-19 to Tinsley's delay is the restricted access to the library and research materials. Lack of adequate access to law libraries has not generally been recognized as an extraordinary circumstance. E.g., Felder v. Johnson, 204 F.3d 168, 171 (5th Cir. 2000); Hall v. Warden, 662 F.3d 745, 752 (6th Cir. 2011); Earl v. Fabian, 556 F.3d 717, 724–25 (8th Cir. 2009). Tinsley could have completed the research during the more than seven months between August 2019 and March 30, 2020, when the library access was not restricted by

13

COVID-19. One cannot wait until the last minute to prepare and then claim that a late emergency has prevented him from timely completion.

## G. Actual Innocence

In balancing the "societal interests in finality, comity, and conservation of scarce judicial resources with the individual interest in justice that arises in the extraordinary case," the Court has recognized a "miscarriage of justice exception" to the statute of limitations when a litigant presents new evidence of actual innocence, showing that, absent constitutional error, "no reasonable juror would have convicted" the defendant. McQuiggin v. Perkins, 569 U.S. 383, 393–95 (2013). When a petitioner presents new reliable evidence, "whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence," the habeas court must consider the new evidence along with the trial evidence to decide whether, in the absence of constitutional error, petitioner likely would not have been convicted. Schlup v. Delo, 513 U.S. 298, 316, 324 (1995).

Tinsley asserts in his opposition to respondent's motion to dismiss that he discovered new evidence after trial that the informant was recorded saying "he would be willing to change his testimony for money and that would be willing to go to media outlets and tell them that the narcotics detectives are tampering and altering their camera equipment." ECF No. 19 at 8. There are numerous problems with Tinsley's position.

First, the informant did not testify at trial and was not subject to cross-examination, so the "newly discovered" evidence would not be admissible. Contrary to Tinsley's allegation, no hearsay statements of the CI were used to convict Tinsley. Recordings of conversations between the CI and the target, whose voice was identified by Investigator Brummit, were

introduced. Brummit or other testifying deputies were on the phone, monitoring and recording each call when made. The recordings were not offered to prove the truth of any statements Brummit made, but only to provide context for T.J.'s statements and for the subsequent recorded transactions between the CI and Tinsley. Accordingly, they were not hearsay. Bennett v. Commonwealth, 69 Va. App. 475, 496, 820 S.E.2d 390, 400 (2018). The Commonwealth was entitled to present its case without calling the CI as a witness, because the circumstantial evidence was sufficient to prove the case beyond a reasonable doubt. Id. at 492, 820 S.E.2d at 398.

Second, the evidence Tinsley refers to is not new. It is not something that he became aware of only after the deadline for filing his petition had passed. Rather, the information was provided to his attorney in discovery three years before Tinsley's trial. See Letter from Attorney for the Commonwealth to Matthew S. T. Clark, Esq. (Feb. 20, 2015), Pet'r's Resp. in Opp'n, Ex. A, ECF No. 19-1 at 1 ("The Commonwealth would like to advise you of potential impeachment information regarding the above referenced confidential informant that was utilized in the case(s) against your client. . . ."). That letter detailed the substance of the CI's statements, referenced above, made to the wife of a defendant in a different case. Tinsley actually or constructively knew about the evidence in 2015; if he did not actually know about the evidence then, he certainly should have known long before 2020 if he exercised due diligence.

Most importantly, Tinsley's new evidence is not evidence of actual innocence; actual innocence "does not merely require a showing that a reasonable doubt exists in the light of the new evidence, but rather that no reasonable juror would have found the defendant guilty."

15

Schlup, 513 U.S. at 329 (emphasis added). In making the determination that, more likely than not, no reasonable juror would convict, the habeas court must consider not only the new evidence, but also all other evidence presented at trial. Had the CI testified, obviously the impeachment evidence would undermine his credibility. The trier of fact could still reasonably decide that the evidence was sufficient to convict, based on the recorded phone calls, video-taped transactions, search of the CIs before and after each transaction, and the CI's delivery of drugs to the investigators after each transaction. Bennett, 69 Va. App. at 492, 820 S.E.2d at 398. Had the CI testified, Tinsley's offered impeachment evidence could create reasonable doubt about the CI's veracity, but it falls far short of suggesting actual innocence. Therefore, Tinsley cannot avail himself of this exception to the statute of limitations.

## III.

For the reasons discussed above, Tinsley's petition is untimely, and none of the exceptions to the statute of limitations apply to his claims.

When issuing a final order adverse to a § 2254 petitioner, the court must issue or deny a certificate of appealability. Fed. R. Gov. § 2254 Cases 11(a). A certificate of appealability may issue only if the movant has made a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2). The movant must show that reasonable jurists could debate whether the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further. Miller-El v. Cockrell, 537 U.S. 322, 338 (2003); Slack v. McDaniel, 529 U.S. 473, 483–84 (2000). In the context of a procedural ruling, the movant must demonstrate both that the dispositive procedural ruling is debatable and that the action states a debatable claim of the denial of a constitutional right.

16

Gonzalez v. Thaler, 565 U.S. 134, 140–41 (2012). Tinsley has not made such showings in this case.

For the foregoing reasons, the court will grant the respondent's motion to dismiss, dismiss the petition for a writ of habeas corpus, and deny a certificate of appealability.

**ENTER:** This 28th day of March, 2022.

Michael F. Urbanski
Chief United States District Judge